THIRD DIVISION
MARCH 10, 2010

No. 1-04-3660

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 22931 |
| | ) | |
| | ) | |
| LEWIS JACKSON, | ) | Honorable |
| | ) | Frank Zelezinski, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE COLEMAN delivered the opinion of the court:

Lewis Jackson appeals his conviction of first-degree murder and the natural life sentence of imprisonment imposed as a result. We agree with his contention that he was denied a fair trial by the admission of evidence of other criminal acts and accordingly reverse his conviction and remand for a new trial.

Jackson was convicted of the 1995 homicide of his disabled aunt, Doris Jackson. At the time of the incident, Jackson lived with Doris in her apartment in a Harvey senior citizens' residence. Doris Jackson's daughter Cassandra testified at trial that after being unable to contact her mother earlier on November 2, 1995, she went to her building at about 6 p.m., asked the building maintenance man to let her into Doris' apartment, and found her mother dead on her bedroom floor. Forensic testimony established that Doris had been stabbed 30 times. Seventeen of her stab wounds were on her arms and hands; those wounds and injuries to her head and leg led

the prosecution's expert to conclude that Doris struggled with her attacker. The prosecution's evidence established that two televisions were missing from the apartment, that Doris usually kept cash on her person, and that cash she had recently received was not found on or near her body.

Police investigators found no sign of forced entry at the apartment. Trial testimony from multiple witnesses established that tenants in Doris Jackson's building received two complete sets of apartment keys and that she kept one set while leaving the other with her ex-husband. The prosecution also presented testimony that raised a circumstantial inference that Jackson, shortly after arriving at a police station to answer questions about his aunt's homicide, dropped keys into a bathroom wastebasket that were later retrieved and proved to be keys to Doris' apartment.

After arriving at the Harvey police station, Jackson spent three days in police custody and gave a total of six different statements to police and prosecutors. The Harvey detective who conducted Jackson's first two interviews and the assistant State's Attorney who spoke to him four times thereafter both testified at trial that Jackson had reported being away from Doris' apartment on the night of November 1, 1995. Each witness testified over defense objection that Jackson stated that he had been using narcotics with friends during the period in question and that he also used such drugs in the hours after Doris Jackson's body was found. Both witnesses testified that Jackson reported returning to Doris' apartment at approximately 10 a.m. on the morning of the homicide. According to the witnesses, Jackson said in his first four interviews that he had been unable to get into his aunt's apartment at that time and that, although he had visited a friend who lived in the same building, he did not return to Doris' apartment until the early predawn hours of November 3, when he found Doris' daughter Cassandra and others cleaning the scene.

Frank Cece, the assistant State's Attorney who interviewed Jackson at the Harvey station, testified that Jackson changed his story in his fifth statement. In that statement, Jackson said that he did enter Doris' apartment when he returned there on the morning of November 2, 1995, and that he saw her lying on her bedroom floor with blood all around her. According to Cece, Jackson said that he had touched Doris and tried to roll her over, then panicked and left the apartment. Cece further testified that in Jackson's sixth custodial statement, he reported that he returned to Doris' apartment on the morning of November 2, blacked out in the apartment's family room, woke up some time later and found her on the floor of the bedroom. As in his immediately previous statement, Jackson said that he had tried to move Doris, then washed her blood from his hands.

Cece and John Rizzi, the Harvey detective who conducted Jackson's first two interviews, both testified that they saw cuts on Jackson's hands. Forensic testimony presented at trial established that small blood stains not matching Doris' DNA profile were found in the tub and toilet of Doris' bathroom; profiles from those samples matched Jackson's DNA. The jury found Jackson guilty of first degree murder, and made the additional findings that the murder was committed in the course of an armed robbery and that it resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty. Jackson was sentenced to a natural life term of imprisonment.

In our initial adjudication of his appeal, this court reversed Jackson's conviction, holding that he had been unduly prejudiced by the admission of evidence that his DNA profile was on file in a state database. People v. Jackson, 372 Ill. App. 3d 112 (2007). This holding was reversed by

our supreme court, which directed this court on remand to consider the issues left unresolved by our original disposition. People v. Jackson, 232 Ill. 2d 246 (2009).

The supreme court, while reversing this court's ruling on the admissibility of evidence regarding Jackson's DNA profile, affirmed our judgment in all other respects. 232 Ill. 2d at 284-85. As a result, the substantive rulings affirmed by the supreme court are law of the case for the instant appeal and will not be revisited. People v. Wilson, 257 Ill. App. 3d 670, 699-700 (1993). We therefore reaffirm our judgments that: (1) the evidence presented at trial was sufficient to support Jackson's murder conviction; (2) police officers had probable cause for Jackson's arrest; (3) Jackson received constitutionally sufficient notice of the prosecution's intention to seek an enhanced sentence; and (4) the jury was not presented with sufficient evidence to support a conviction of armed robbery.

Jackson contends that he was denied a fair trial by a prosecutor's statement during rebuttal argument that Frank Cece, the assistant State's Attorney who interviewed him at the police station, "can be believed." We disagree. Although a prosecutor may not vouch for a witness or invoke the credibility of his office in argument, he is permitted to comment on the strength of the evidence. People v. Emerson, 122 Ill. 2d 411, 434 (1987), People v. Yates, 98 Ill. 2d 502, 532 (1983). Applying this principle, Illinois courts have consistently held that prosecution arguments similar to that at issue in the instant case are not improper: "'We know that [the witness] was telling you the truth'" (People v. Emerson, 122 Ill. 2d at 434-35)   "'We know [the witnesses] are not lying'" (People v. Malone, 211 Ill. App. 3d 628, 638-39 (1991)); "'[The witness] is believable. *** [The witness] is correct'" (People v. Pryor, 170 Ill. App. 3d 262, 273 (1988)). It is thus

apparent that the prosecution's assessment of Frank Cece's testimony in the instant case is permissible commentary that cannot serve as a basis for disturbing Jackson's conviction.

Jackson next argues that he was deprived of a fair trial by prosecution statements during closing argument that appealed to the passions and prejudices of the jury, including the statement that Doris Jackson was "screaming out for justice." We are unpersuaded by this argument. A prosecutor is permitted to urge the jury to administer justice. People v. Cullen, 233 Ill. App. 3d 794, 800 (1992); People v. Morrison, 137 Ill. App. 3d 171, 184 (1985). Phrasing the call for justice as an invocation from the victim is not reversible error. People v. Favors, 254 Ill. App. 3d 876, 896-97 (1993). In People v. Jefferson, 257 Ill. App. 3d 258 (1993), the prosecution's closing argument asked the jury to give the victim "his day in court"; this court held that the argument "merely encouraged the jury to consider the victim of the crime and his conduct during its deliberations" and was not reversible error. 257 Ill. App. 3d at 271-72. We believe that the Jefferson court's analysis applies with equal force to the case at bar and that the prosecution's references to Doris Jackson in closing did not deny Lewis Jackson a fair trial and do not require reversal of his conviction.

Jackson asserts that the prosecution improperly shifted the burden of proof to him by emphasizing his failure to present results of DNA testing of various items found at the crime scene, including clothes, bedding, and hair. This emphasis occurred during redirect examination of the prosecution's expert DNA witness and during rebuttal argument. These references occurred only after defense cross-examination and closing argument highlighted the State's failure to seek testing of the same items. While the prosecution is generally not permitted to comment on a defendant's failure to produce evidence, such comments are not improper after a defendant

with equal access to that evidence assails the prosecution's failure to produce it. People v. Patterson, 217 Ill. 2d 407, 446-47 (2005). In the instant case, the prosecution established that its DNA expert witness was available to both Jackson and the State and that the untested items had not been the subject of an examination request by either party. The prosecution's questions and argument on this subject were proper responses to the defense's suggestion of doubt regarding the lack of testing and do not warrant reversal of Jackson's conviction.

Jackson also claims that the prosecution improperly minimized its burden of proof during closing argument. The prosecution commented: "[I]n any case, you are going to find if you put an investigation under a high powered microscope that there is [sic] going to be some inconsistencies, there is [sic] going to be some screw-ups, there is [sic] going to be some mistakes, there is going [to be] some incompetency. And you know what, it doesn't matter. That's why the law says that the State only has to prove his guilt beyond a reasonable doubt. Not every doubt. Not everything that they bring up. The law doesn't say that. If the State had to cross every T and dot every I in every investigation, nobody would ever be investigated. Everybody could run free and go ahead on a killing spree."

A prosecutor's implication that the burden of proof beyond a reasonable doubt is merely "*pro forma*" or a "minor detail" is improper. People v. Frazier, 107 Ill. App. 3d 1096, 1102 (1982). Our supreme court has explicitly disapproved attempts by counsel to define reasonable doubt. "Reasonable doubt is a term which needs no elaboration and we have so frequently discussed the futility of attempting to define it that we might expect the practice to be discontinued." People v. Malmenato, 14 Ill. 2d 52, 61 (1958). In People v. Edwards, 55 Ill. 2d 25 (1973), the court, although finding that a prosecution's attempt to explain reasonable doubt

was not reversible error, advised that the "better practice" was "not to attempt to define the term 'reasonable doubt' either in *voir dire* or closing argument."  55 Ill. 2d at 35.

In People v. Eddington, 129 Ill. App. 3d 745 (1984), the appellate court admonished the prosecution for remarks in closing argument that served to "de-emphasize the State's burden." 129 Ill. App. 3d at 781.  The Eddington court relied upon other grounds for reversal of the defendant's conviction and did not hold that the closing comments were reversible error, but noted that the prosecution's attempt to describe the burden of proof was more objectionable than remarks generally found to be insufficiently prejudicial to warrant reversal of a conviction.  129 Ill. App. 3d at 781.  The court concluded: "We trust the prosecutor will not address the definition of reasonable doubt on retrial."  129 Ill. App. 3d at 781.

As in Eddington, the prosecution's discussion of reasonable doubt in the instant case extended beyond the nature of comments found by Illinois courts to be insufficient to require reversal.  In our view, the significance of  "inconsistencies," "screw-ups," "mistakes" and "incompetency" in the course of Jackson's investigation and prosecution is to be determined by the trier of fact, and we believe that the prosecution incorrectly stated the law in suggesting that the reasonable doubt standard made the shortcomings in its case irrelevant.  In light of the closely balanced nature of the evidence in the instant case, we believe that the Eddington court's cautionary statements should be considered particularly noteworthy on retrial.

Jackson also contends that he was denied a fair trial by the prosecution's introduction of portions of his custodial statements that included repeated references to his drug use.  In his six statements to police and prosecutors, Jackson recounted several instances of drug use on the night before and the day of Doris Jackson's homicide, and these statements were presented to the

7

jury in their entirety. We agree with Jackson's contention that the references to his drug use should not have been presented to the jury.

Although Jackson objected to the admission of his statements as hearsay, he did not argue at trial that their references to his drug use were prejudicial because they revealed his commission of other crimes, and the State argues that he has forfeited the right to seek review of the issue here. However, the plain error doctrine permits review of otherwise forfeited errors in criminal trials where the evidence was closely balanced or where the error was of sufficient magnitude that the defendant was denied a fair and impartial trial. People v. Vargas, 174 Ill. 2d 355, 363 (1996). Both prongs of the plain error doctrine are satisfied in the case at bar.

In assessing the sufficiency of the evidence presented to support Jackson's conviction, our initial opinion stated: "There was not overwhelming evidence of defendant's guilt presented in this case, and in fact we would characterize this as a very close case ***." Jackson, 372 Ill. App. 3d at 120. Our supreme court reached a similar conclusion: "[W]e agree with the appellate court that there was not overwhelming evidence of defendant's guilt presented in this case ***>" Jackson, 232 Ill. 2d at 284. Jackson did not confess to the crime, no evidence connected him to the murder weapon, and the evidence of his blood in the bathroom of Doris' apartment was mitigated by the absence of any other evidence of his blood elsewhere and the fact that he was a resident of the apartment. In summary, the evidence, while sufficient to permit a jury to find Jackson guilty of murder, was sufficiently closely balanced to permit review of otherwise forfeited claims under the plain error doctrine.

The plain error doctrine is also properly invoked in the instant case because of the significance of the admission of evidence of Jackson's drug use. "The erroneous admission of

evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal." People v. Lindgren, 79 Ill. 2d 129, 140 (1980). Accordingly, such error has been held to warrant review under the plain error doctrine. People v. Chambers, 259 Ill. App. 3d 631, 636 (1994); see also People v. McMillen, 281 Ill. App. 3d 247, 251-52 (1996). In view of the foregoing, we conclude that the plain error doctrine allows substantive review of Jackson's claims that evidence of his drug use was improperly admitted.

Evidence of crimes for which the defendant is not on trial is not admissible to establish his propensity to commit crime. People v. Lindgren, 79 Ill. 2d 129, 137 (1980). Such evidence may be admissible for other purposes, such as proof of motive (People v. Robinson, 167 Ill. 2d 53, 62-63 (1995)), and in the instant case, the State argues that Jackson's drug use established his motive for the crime: he wanted to rob her for drug money. But unprosecuted drug use is admissible to establish motive for a charged offense only after the prosecution has demonstrated that the defendant was addicted to narcotics and that he lacked the financial resources to sustain his habit. People v. Maounis, 309 Ill. App. 3d 155, 159-60 (1999). See also People v. Klimawicze, 352 Ill. App. 3d 13, 27 (2004). Neither fact was established in the instant case. No evidence was introduced to establish that Jackson's drug use was habitual rather than recreational, and his statements regarding his financial condition indicated that he was not in need of money at the time of Doris' murder because he had cashed an unemployment benefit check. It is thus apparent that the prosecution did not present sufficient preliminary evidence to permit introduction of Jackson's drug use as proof of his motive to kill Doris.

The State's argument that Jackson's drug use was admissible to establish motive rather than mere criminal propensity is also contradicted by the prosecution's references to Jackson's

conduct.  In rebuttal, the prosecutor, commenting on Jackson's statement that he left Doris' apartment after discovering her body, said, "Incredibly this guy doesn't go and get help.  He goes out and parties.  He goes out and gets crack and is drinking until one o'clock in the morning." This comment shed no light on the circumstances of Doris' murder or any possible motive for Jackson's commission of the crime.  Instead, it suggested that he was a person of bad character. Our supreme court has explained that evidence of other crimes is improper because it "overpersuades the jury, which might convict the defendant only because it feels he or she is a bad person deserving punishment."  People v. Lindgren, 79 Ill. 2d 129, 137 (1980).   The prosecution's commentary in the instant case was precisely the bad-character accusation prohibited by the rule against admission of other crimes to show criminal propensity.  We find that the admission of evidence of Jackson's drug use requires reversal of his conviction and a new trial.

Because of their potential relevance to further proceedings, we address two additional arguments asserted by Jackson in the instant matter.  He claims that the trial court erred in failing to instruct the jury on the definition of "wanton cruelty" before allowing it to find him eligible for an enhanced prison sentence because his crime resulted from "exceptionally brutal or heinous behavior indicative of wanton cruelty."  We agree with Jackson's contention that the failure to instruct the jury on the definition of wanton cruelty is error.  People v. Smith, 362 Ill. App. 3d 1062, 1088-89 (2005).  However, Jackson did not object to the omission of a wanton cruelty instruction at trial, nor did he submit a proposed definition for presentation to the jury.  As a result, the trial court's failure to give the proper instruction can be considered reversible error only if the record demonstrates a risk that the jury erroneously found Jackson eligible for an enhanced sentence because it failed to properly interpret the undefined term.  People v. Hopp, 209 Ill. 2d 1,

12 (2004); People v. Smith, 362 Ill. App. 3d 1062, 1088-89 (2005). Our review of the record suggests no such risk. The forensic evidence presented at trial indicated that Doris Jackson suffered numerous stab wounds and substantial injuries in a struggle to defend herself before receiving the stab wounds that caused her death. This evidence is consistent with the definition of wanton cruelty: the conscious effort to inflict pain and suffering on the victim of the offense. People v. Nielson, 187 Ill. 2d 271, 299 (1999). Therefore, although we find that the jury should have been instructed on the definition of wanton cruelty, we hold that there was no risk that the erroneous omission of the instruction caused an improper finding on enhanced sentence eligibility. We therefore find that the omission did not require a new sentencing hearing.

Finally, Jackson claims that the trial court should have bifurcated the guilt and sentence enhancement phases of his trial because graphic autopsy photographs introduced to prove the brutal nature of Doris Jackson's murder created an undue risk of prejudice against him in the consideration of his guilt. We rejected this claim because, at the time of his initial trial, Illinois law did not provide for such bifurcation. Jackson, 372 Ill. App. 3d at 126. Supreme Court Rule 451(g) (210 Ill. 2d R. 451(g)), made effective after Jackson's trial, now grants trial courts the discretion to bifurcate the guilt and sentence-enhancement phases on motion of a party. We believe that such discretion is available to the trial court on retrial of the instant matter.

For the foregoing reasons, we reverse Jackson's conviction and sentence and remand to the circuit court of Cook County for further proceedings consistent with this opinion.

Reversed and remanded.

CUNNINGHAM, P.J., and KARNEZIS, J., concur.